**UNITED STATES of America, Plaintiff,**

v.

**Monica Anne WHITE, Defendant.**

**No. CR 99–40121–03.**

United States District Court, D. South Dakota, Southern Division.

Dec. 23, 1999.

Dennis A. Holmes, U.S. Attorney's Office, Sioux Falls, SD, for plaintiff.

Michael B. Crew, Karen L. Crew, Sioux Falls, SD, for defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

This matter came before the Court through reports, by the government and the defense, that a member of the jury panel had been contacted by a private investigator employed by the defendant, Monica Anne White. Defendant is charged, along with another man and another woman, in an indictment alleging conspiracy to possess methamphetamine with intent to distribute, 21 U.S.C. § 846, possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1), and interstate travel in aid of racketeering, 18 U.S.C. § 1952. Her case was scheduled for trial on December 7, 1999. A hearing on defendant's investigation and issues it raises was held on December 3, 1999, the same day the Court learned about the investigation.

Pam Mulloy, a private investigator employed by Star Investigations in Sioux Falls, South Dakota, testified at the hearing. Mulloy testified that she questioned the neighbors of prospective jurors in Sioux Falls and surrounding small towns. According to Mulloy, she approached a member of the jury panel, LaDawn Dykhouse, thinking that Dykhouse was Dykhouse's neighbor. Mulloy told Dykhouse that she had been employed by defendant's attorney to research prospective jurors in a case which was scheduled for trial, and

asked Dykhouse if she would answer questions about the personality of a prospective juror, such as whether the juror was reserved or outgoing. When Mulloy told Dykhouse that the prospective juror's name was LaDawn Dykhouse, Dykhouse informed Mulloy that she was talking to the prospective juror, not her neighbor, and Mulloy terminated the interview.

Mulloy testified that she had personally investigated nine members of the jury panel on December 2 and 3, 1999, and that, in the course of those investigations, she had contacted about twelve neighbors or other persons who knew the panel members in some way. According to Mulloy, her coworkers at Star Investigations had conducted investigations on other members of the panel, and were conducting investigations as the hearing proceeded. To Mulloy's knowledge, LaDawn Dykhouse was the only prospective juror who was contacted in the course of those investigations.

In *Gideon v. United States*, 52 F.2d 427 (8th Cir.1931), the Eighth Circuit recognized that extra-judicial investigations of prospective jurors prior to trial can destroy the impartiality of the jurors who are eventually chosen. In *Gideon*, which involved a prosecution under the National Prohibition Act, the court held that the jury which tried the defendant had been tainted by a questionnaire sent by clerk of the district court to prospective jurors. *Id.* at 429. The questionnaire asked the prospective jurors, among other things, what religious denomination, if any, they were members of, and whether they favored Prohibition. *Id.* at 428–29. The court noted the possibility that these questions negatively affected the jurors' ability to deliberate:

The effect of this questionnaire upon the jurors must have been baneful; they must have been led to believe that the government had some purpose in asking questions about their beliefs, and was keeping a record of the answers for future use; they doubtless were led to believe also that, in the minds of the government officials, at least, their usefulness as jurors was in some way affected by the beliefs about which inquiry was made; and it is not impossible that they were led to think that the government intended to influence them in their beliefs.

*Id.* at 429. The court also wrote broadly against out-of-court questioning of prospective jurors:

The qualifications of a juror should be ascertained by questioning in open court in the presence of the parties interested and while the juror is under oath. Secret preliminary questioning is unauthorized, and, in our opinion, should not be encouraged. It is open to the danger of many and serious abuses, and entrenches upon the broad ground of a fair trial.

*Id.* The *Gideon* court thus acknowledged that certain pre-trial investigations can threaten the impartiality of the jury and expressed a preference for in-court questioning as a method of ensuring juror impartiality.

■ The investigation in this case posed similar dangers to the impartiality of the jury panel.[1] It makes no difference that this investigation was conducted by the defense rather than in government. *See id.* ("Had such a questionnaire been sent out by attorneys for some of the defendants awaiting trial, we cannot doubt that the proceeding would have been open to

---

1. In contrast, the Court is not troubled by less intrusive means of investigating prospective jurors, such as examining public records on voter registration, driver registration and property valuation, or driving down public streets to view the residences and neighborhoods of prospective jurors. For a general discussion of pre-trial investigations of jurors, see David Weinstein, *Protecting a Juror's Right to Privacy: Constitutional Constraints and Policy Options*, 70 Temp.L.Rev. 1, 33–38 (1997). As noted in that article, the ABA Criminal Justice Standards Committee has promulgated ethical standards which appear to discourage the type of investigation conducted in this case. *See ABA Standards for Criminal Justice: Prosecution Function and Defense Function*, Standard 4–7.2 (1993).

severe criticism.") Nor can the defense's investigation be justified on the ground that the investigators did not ask prospective jurors about their beliefs. In *Sinclair v. United States*, 279 U.S. 749, 49 S.Ct. 471, 73 L.Ed. 938 (1929), the Supreme Court recognized that private investigators can impair a jury's ability to deliberate fairly without ever questioning the jurors:

> The jury is an essential instrumentality-an appendage-of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law. The most exemplary resent having their footsteps dogged by private detectives. All know that men who accept such employment commonly lack fine scruples, often willfully misrepresent innocent conduct and manufacture charges.[2] The mere suspicion that he, his family, and friends are being subjected to surveillance by such persons is enough to destroy the equilibrium of the average juror and render impossible the exercise of calm judgment upon patient consideration.

*Id.*, 279 U.S. at 765, 49 S.Ct. at 476. While *Sinclair* involved the constant surveillance of actual jurors during the trial of a case, and not pre-trial investigation, its rationale extends to the pre-trial investigation of prospective jurors through their acquaintances when it is reasonable to assume that the jurors may learn of the investigation. *See* Joshua Okun, *Investigation of Jurors by Counsel: Its Impact on the Decisional Process*, 56 Geo.L.J. 839, 856–57 (1968).

Defendant's investigation remains troubling, despite the fact that it has not been shown to have intimidated any particular juror.[3] In *Dow v. Carnegie–Illinois Steel Corp.*, 224 F.2d 414 (3d Cir.1955), the court held that *Sinclair* did not apply to a pretrial investigation of prospective jurors in a civil case in Pittsburgh, Pennsylvania, because "it [had] not been shown that the 'reasonable tendency' of the activities of the investigator service was to intimidate." *Id.*, 224 F.2d at 431. This reading of *Sinclair* is too narrow. *Sinclair*'s rationale applies not only to activities which intimidate jurors, but to all activities which "destroy the equilibrium of the average juror and render impossible the exercise of calm judgment upon patient consideration." *Sinclair*, 279 U.S. at 765, 49 S.Ct. at 476. As *Sinclair* describes, an investigation is likely to cause such an effect by arousing resentment in the jurors who are its targets. *Id.*[4] Mulloy appeared to acknowledge that her investigations are likely to jeopardize the impartiality of otherwise unbiased jurors who learned about them, by testifying that she instructs the persons whom she interviews not to inform prospective jurors about the interview until the trial is over.

In addition, the "reasonable tendency" of an investigation such as this, in a case such as this, is to intimidate at least some of the jurors who learn about the investigation. Unlike *Dow*, which was a civil case, this case involves criminal charges of drug distribution and conspiracy. It has been the Court's experience in speaking with jurors about their jury service that jurors bring up their concern for their own safety during and after some criminal cases, especially drug cases. While defendant is a woman and the sole defendant on trial in this drug case, the jurors will learn

2. While this Court does not adopt general view of private detectives expressed in the *Sinclair* opinion with respect to the particular private investigator in this case, it notes that public distrust and resentment of private investigations is all that is necessary to support *Sinclair*'s conclusions about the dangers such investigations pose to trial by jury.

3. It has not been shown, nor does the Court believe, that the defense intended its investigation to intimidate prospective jurors. Regardless of the intent behind it, however, the investigation produced the possibility of such intimidation.

4. In this case, it came to the Court's attention, through a telephone call from Ms. Dykhouse to the Clerk's office, that Ms. Dykhouse very much resented the defense's investigation of her personal life.

at trial that there are two other defendants, one of whom is a man, who have pleaded guilty to the same indictment that was filed against this defendant. In the Court's experience, in a criminal drug case such as this, it is not farfetched to expect jurors to feel intimidated by or prejudiced toward a defendant who, they learn, has conducted an investigation of their personal lives by interviewing their next-door neighbors.

Nor is it farfetched to expect at least some of the prospective jurors to have learned about an investigation conducted through their neighbors. The *Dow* decision explicitly noted that Pittsburgh is a "densely populated" area. *Dow*, 224 F.2d at 431. In contrast, the prospective jurors living in Sioux Falls live in a small city which is less densely populated than Pittsburgh, and prospective jurors from outside of Sioux Falls live in communities which are considerably less densely populated. It is entirely reasonable to expect at least one interviewee in these areas to tell a prospective juror living next door or down the street about a private investigator who came asking for information on that juror. Moreover, while private investigations may be helpful even in a small city like Sioux Falls, they do not appear to be as essential as they are in larger metropolitan areas, such as Pittsburgh. *See id.* (noting that juror investigations help litigants intelligently exercise the right to challenge jurors "in densely populated areas where the realm of one's own acquaintances is necessarily limited").

Finally, the *Dow* court failed to account for the dilemma that pre-trial juror investigations pose for voir dire. Once it has come to light that jurors may have been contacted by private investigators or have learned that they are the subject of an investigation, both parties might justifiably desire to question and, if necessary, challenge the prospective jurors in order to ensure that the jury is not biased for or against the investigating party, by resentment, fear or some other state of mind. However, the very questioning of jurors about private investigations as intrusive as this would probably create fear or resentment where none existed before, and thus prevent voir dire from performing its essential role in ensuring impartial juries. Voir dire plays a more valuable role than private investigation in the formation of such juries, and so deserves protection even at the expense of private investigation. *See Kiernan v. Van Schaik*, 347 F.2d 775, 780 (3d Cir.1965) ("The impartiality of jurors should be tested under the control of the court rather than by the unsupervised activity of investigators with all the undesirable possibilities of intimidation and jury tampering which such surveillance inevitably presents.").

A court "may control pre-trial investigation, or prohibit it altogether, without violating any constitutional strictures, so long as voir dire protection is sufficiently preserved so as to identify and disqualify [biased jurors]." *Allen v. Snow*, 489 F.Supp. 668, 672 (D.Mass.1980).[5] In this case, the best means of preserving the protections of voir dire against the threat of a jury biased by defendant's investigation appears to be continuing defendant's trial until after January 1, 2000, when a new jury panel will be in place. Defendant consents to this solution. Accordingly,

IT IS ORDERED that defendant's December 7, 1999 trial date is stricken and her trial is scheduled to begin on February 1, 2000, at 9:00 a.m.

---

**5.** While *Allen* dealt explicitly with an investigation of prospective jurors in state court, its reasoning as to a state court's ability to restrict pre-trial investigations under the United States Constitution applies with equal force to federal district courts.