**Howard Dean HANSEN, a/k/a Dean Hansen, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 18922.

United States Court of Appeals Eighth Circuit.

April 25, 1968.

Joseph H. Bottum, III, Pierre, S. D., for appellant.

David V. Vrooman, Asst. U. S. Atty., Sioux Falls, S. D., for appellee; Harold C. Doyle, U. S. Atty., on the brief.

Before MATTHES, GIBSON and HEANEY, Circuit Judges.

GIBSON, Circuit Judge.

Appellant Howard Dean Hansen was convicted of grand theft of 3 head of cattle from an Indian on the Crow Creek Indian Reservation in South Dakota in violation of Title 18 U.S.C. §§ 1152 and 661; and was sentenced to four years imprisonment and fined $1,000.

On appeal Hansen claims error, (1) in the denial of Hansen's motion to challenge the jury array, (2) in not sustaining Hansen's objection to the introduction of exhibits that were not furnished to Hansen (in accordance with a pretrial order on discovery), and (3) on the basis of the accumulated effect of the Court's ruling on the first two alleged errors, in the denial and receipt of evidence, and various miscellaneous complaints.

Hansen, a young man of 23, operated his mother's ranch which was located in close proximity to the ranch of an Indian, Jerome Irving. Irving missed some of his cattle in October 1965, and in the spring of 1966 the Production Credit Corporation, which had a mortgage on Irving's cattle, determined that 33 head were missing.

On October 5, 1965 Hansen sold 14 head of cattle at the Magness Faulkton

Livestock Exchange [1] and on October 26, 1965 sold 25 head of cattle at the same Exchange. Bill Henderson purchased 6 head of the cattle sold by Hansen on October 26, 1965. Henderson then on April 21, 1966 sold these 6 head of cattle, along with other cattle. Sylvester Schmidt purchased 1 head of the Hansen cattle. Three of the heifers and 2 of the steers purchased from Hansen were sold to Ray F. Anderson on April 21, 1966 for the account of Kenneth O'Hare, which cattle along with other cattle were shipped to O'Hare at Ainsworth, Nebraska. Also on October 26, 1965 Hansen sold 3 head of cattle to Gerald Boekelheide, which were shipped to Boekelheide's son-in-law Dexter Gunderson at Irene, South Dakota.

The animal purchased by Schmidt was found to have Jerome Irving's Reverse RV brand on it, as did a cow found in the pasture of Gunderson, and as did 2 heifers found in the pastures of O'Hare. These cattle found in pastures near Highmore, South Dakota and Yankton, South Dakota were recognized by Irving as his cattle and were the subject of the indictment along with 1 of the 2 head of cattle observed in the pasture of O'Hare near Ainsworth, Nebraska.

In a pretrial order the Court ordered the Government to provide Hansen prior to May 1, 1967 with a copy of any books, papers or documents coming into the possession, custody or control of the Government, which the Government intended to utilize at the trial. Pursuant to this order the Government provided Hansen with several sellers' sheets, some buyers' sheets, the names and addresses of the present owners and possessors of the 3 cattle involved in the indictment and photographs of the 3 animals. It was necessary to use the livestock records to trace the 3 allegedly stolen cattle from the sale by Hansen on October 26, 1965 to the farms or ranches of Schmidt, Gunderson and O'Hare. The buyers' sheets, which were to a substantial extent, supplementary of the sellers' sheets, were examined by the Government on May 11, 1967 but were not furnished to, nor called to the attention of Hansen's counsel or the court. The trial Court allowed some of these buyers' sheets admitted into evidence over Hansen's objection. Hansen claims this was a clear violation of Rule 16(g), Fed.R.Crim.P. and that the trial Court should have either denied the admission into evidence of these records or else granted a continuance. The other errors complained of will be discussed in a consideration of Hansen's "catchall" objection of accumulated errors. Hansen did not take the stand but the record discloses that he had his own cattle brand and had about 35 head of cattle.

## CHALLENGE TO THE ARRAY

Hansen contends that the jury was not representative of the community because an eligible group had been excluded in its selection; that he was individually prejudiced by the exclusion of farm laborers and by the inclusion of an inordinately large proportion of jurors from the upper economic and social classes. The hearing on the challenge to the array showed some 22,000 employed persons in the Central Division of the Court, which were further broken down into approximately 16,000 males and 6,000 females. Of the employed males 6,000 were employed as farmers or farm managers, almost 1700 as farm laborers or farm foremen and 741 employed as laborers; of the total employed population 9.1 per cent were employed

---

[1]. The Government attempted to prove during the trial of the case that some of the cattle sold October 5, 1965 were stolen from Irving but failed to adduce sufficient proof to leave this issue in the case. All of the cattle that are the basis of the indictment were alleged to be sold by Hansen on October 26, 1965. We are thus concerned in this opinion with only the allegedly stolen cattle sold by Hansen on October 26, 1965. Some evidence tentatively admitted on sales made October 5, 1965 was ordered stricken; and other evidence proffered relating to the October 5th sales was not admitted.

as farm laborers or farm foremen and 3.5 per cent employed as laborers.

The affidavit in support of the challenge to the array related in the opinion of counsel for Hansen there were no persons on the jury with a family income of less than $5,000 and some testimony was adduced that there were few, if any, farm laborers on this or prior jury lists. There was also testimony that less than 5 per cent of the jurors, year in and year out, were under the age of 30. The record is not adequate to show how the jurors actually were selected, although apparently the key man system was used in securing names for the jury wheel. Neither the Clerk of the District Court nor the Jury Commissioner was called to testify. A typist for the Clerk testified she sent out the letters requesting the names of persons who might be qualified to serve as federal jurors. Approximately 50 per cent of the names were selected by the Clerk and 50 per cent by the Jury Commissioner. There was no evidence whatsoever of how the Jury Commissioner selected the names. Hansen sought to position himself as a young farm laborer and complains in particular of the exclusion from the jury lists of any farm laborers. The Government concedes that farm laborers and farm foremen are a separate economic class but contends that there was no systematic exclusion of any economic or social class in the selection of names for the master jury wheel.

■ Any litigant is entitled to a jury list selected from a cross-section of the eligible persons without discrimination as to race, religion, politics, economic, or social status. Under the existing federal system, the law having been changed in 1957 [2] from an inclusion of state standard qualifications to a uniform federal standard of qualifications, any citizen who has attained the age of 21 years and resided within the judicial district for one year is competent to serve as a juror, unless he has been convicted of a felony or is unable to read, write, speak and understand the English language or unless he is mentally or physically incapable of rendering efficient jury service. Title 28 U.S.C. § 1861. The precise method of selection is not detailed by law,[3] and the courts and appropriate officials are invested with discretion and considerable latitude in the selection of jurors. The officials, however, are under a duty to provide a fair and impartial jury list selected from the many eligible citizens residing in the district. We are not here concerned with the exemptions or exclusions and the only explicit statutory direction is that the jury box contain the names of at least 300 qualified persons at the time of each drawing; the box to be refilled from time to time by the Clerk of the Court and the Jury Commissioner. § 1864. By the same section the names are to be placed in the jury box without reference to party affiliations. There are other general guidelines for geographical selection to insure an impartial trial, and not to incur unnecessary expense. § 1865. Section 1866 even allows, when needed, the summoning of talesmen from the bystanders for petit juries. There is a specific direction in Title 28 U.S.C. § 1863(c) and in Title 18 U.S.C. § 243 against disqualifying any juror on account of race or color. Within these broad provisions and limitations the Clerk and the Jury Commissioner have the duty of selecting and composing a representative list of qualified jurors. This does not mean that every class and subclass or identifiable group must be represented on

---

2. State law also determined exemptions prior to 1948. 62 Stat. 952. Present § 1862 of Title 28 U.S.C. (enacted in 1948) now governs exemptions.

3. Pub.L. No. 274, 90th Cong., 2d Sess. (March 27, 1968) sets out in considerable detail the method to be employed in

the selection and qualification of jurors, all based on an enunciated plan for random jury selection. This Act does not govern the present case and does not become fully effective until 270 days after its enactment.

every list, but it does mean that there should be no systematic or intentional exclusion of any qualified person or group.

Mr. Justice Murphy in Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946), set forth the appropriate standards to be applied in jury selections:

"The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. Smith v. State of Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84; Glasser v. United States, 315 U.S. 60, 85, 62 S.Ct. 457, 471, 86 L.Ed. 680. This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury."

Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) condemned the systematic exclusion of persons of Mexican descent from jury service and held that the constitutional guarantee of equal protection of the laws under the Fourteenth Amendment applies to discrimination on jury service between any recognized and distinct class of individuals, pointing out at p. 478, 74 S.Ct. at p. 670:

"When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated."

Most of the cases dealing with jury service discrimination are based on state laws and state court practices, and the standards applied to determine the validity of jury selection methods in federal cases are different from the standards applied to state court cases, as the applicable standards rest on a different source of power. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). The concepts of a properly constituted jury at the time of the adoption of our Constitution were quite limited and have thus evolved to the present day under the guiding hand and supervisory power of the administration of justice in the federal courts by the United States Supreme Court and the Court of Appeals. Fay v. People of State of New York, 332 U.S. 261, 287, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947).

The Third Circuit in Dow v. Carnegie-Illinois Steel Corporation, 224 F.2d 414 (1955), cert. denied 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842 in addition to stating the general principal that the jury list must be compiled from a representative cross-section of the community qualified for jury service and that recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society (quoting from the *Thiel* case), expanded the classic test of "intentional and systematic exclusion" by placing the added duty on jury officials " * * * at least in the federal system, not to exclude any cognizable groups from jury lists through neglect as well as through intentional conduct." 224 F.2d at p. 424. Earlier, Glasser v. United States, 315 U.S. 60, at pp. 85–86, 62 S.Ct. 457 at p. 472, 86 L.Ed. 680 (1942) stated in broad terms the standard to be followed as:

"Our notions of what a proper jury is have developed in harmony with our

basic concepts of a democratic society and a representative government. For 'It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.' Smith v. [State of] Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84.

" * * * And, its exercise [selection of jurors] must always accord with the fact that the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a 'body truly representative of the community', and not the organ of any special group or class. If that requirement is observed, the officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. * * * "

■■ This Circuit in Bailey v. Henslee, 287 F.2d 936, at p. 942 (8 Cir. 1961), cert. denied 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78, held that a jury must be selected without discrimination on the basis of race but that:

"Discrimination in a jury's selection must of course be proved; it is not to be presumed. Tarrance v. State of Florida, 188 U.S. 519, 520, 23 S.Ct. 402, 47 L.Ed. 572. The burden of establishing the discrimination is upon the defendant. Akins v. State of Texas, supra, at page 400 of 325 U.S. [398], at page 1277 of 65 S.Ct. [1276, 89 L.Ed. 1692]. He may, however, establish a prima facie case of discrimination of this kind and, if he does, the burden then passes to the state to refute the discrimination."

Tarrance v. State of Florida, 188 U.S. 519, at p. 520, 23 S.Ct. 402 at p. 403 (1903) in discussing racial discrimination in juries, said: "But such an actual discrimination is not presumed. It must be proved or admitted."

Hansen contends he made a prima facie case of discrimination by showing that there were no farm laborers on this present jury list and few, if any, farm laborers on prior jury lists. The evidence produced at the hearing on this issue is not adequate nor conclusive. The challenger to the jury array has the burden initially of showing a prima facie discrimination. *Tarrance* and *Bailey,* supra. In this case there is no evidence actually as to how the jury lists were made up. There is no evidence of any intentional or systematic exclusion of either younger persons or farm laborers from the jury list, and the evidence on the lack of farm laborers on the present jury list and some prior lists is vague and nebulous. As noted in Pope v. United States, 372 F.2d 710, 723 (8 Cir. 1967) (cert. pending) " * * * the burden of proof is on the defense as to this feature of its attack on jury selection. That burden is not met by generalizations, unsupported by specific proof, * * * ." A jury need not be composed of individuals proportionately representing each recognized class or group; in fact, proportional representation is forbidden. Bailey v. Henslee, supra. The theory of a fair jury selection and a constitutional prerequisite is that the jurors be selected from a group chosen at random without regard to discrimination of any kind as to those eligible to serve.

■ Chief Judge Nichol denied the challenge to the array with the following comment:

"That it [the evidence] wholly fails to show that the selection of the persons in the panel, at least since 1964 to date, that there's been any systematic exclusion of any particular wage group, or race, color, creed, or any exclusion of any person by reason of income or occupation;

"And that the Court therefore finds that even though there may not be any particular farm laborers on this particular panel, that the defendant himself is not entitled to have on his panel a person that does exactly the same type of work he does, as long as there is a fair cross-section of the people in this particular Division;

"And that the Court takes the view that the defendant's counsel has failed

to carry the burden of showing that there has been a systematic exclusion either of farm laborers or laborers of other kinds who might be somewhat in the same general income or age group as the defendant, * * *."

There is in addition evidence in the record that there were many people of only average or even below average incomes, working at ordinary jobs, who were called for jury service. Some had low incomes, some were unemployed and many were from the working classes. In view of the finding of the trial judge, we do not think Hansen made a prima facie showing of discrimination in the composition of the jury list. The Government, therefore, was not obligated to assume the burden of showing there was no intentional or systematic or even neglectful exclusion of any class. Frazier v. United States, 335 U.S. 497, 503, 69 S.Ct. 201, 93 L.Ed. 187 (1948).

## DENIAL OF APPELLANT'S MOTION FOR MISTRIAL OR CONTINUANCE BECAUSE OF EVIDENCE ADMITTED IN VIOLATION OF THE PRETRIAL ORDER

- The trial Court on motion pursuant to Rule 16, Fed.R.Crim.P., (Discovery and Inspection) ordered the Government to provide the defendant prior to May 1, 1967 with copies of any papers or documents coming into the possession, custody or control of the Government which the Government intended to utilize at the trial. The Government complied with this order for documents in its continued possession but did not supply copies nor information thereof to the defendant or the Court about livestock buyers' sheets, which it had examined on May 11, 1967. No copies were made of these sheets but they were subpoenaed and offered as evidence in the trial. Hansen's contention is that under Rule 16(g) the Government had a continuing duty to disclose this additional evidence and that the Court erred in failing to apply sanctions of granting a continuance or prohibiting the Government from introducing into evidence the undisclosed documentary evidence. An examination of this evidence is necessary to evaluate the validity of Hansen's complaint and the action of the trial judge in the admission of some of the evidence.

Without going into needless detail, the Government furnished Hansen with the sellers' sheets on all the cattle in question and other information relating to the present owners and location of the cattle. This was certainly sufficient to apprise Hansen of the charge against him. At the trial the Government sought to introduce 17 buyers' sheets which had not previously been supplied to Hansen. We think either Hansen or the Court should have been advised of the evidence in advance of trial, but the application of sanctions and the admission of the evidence were discretionary matters for the Court. See "Remarks on Discovery" by Mr. Justice Brennan, 33 F.R.D. 47, 65 (1963). The buyers' sheets were supplementary of, and complementary to, the sellers' sheets and showed the name of the purchaser, whereas the sellers' sheets designated the purchaser by number. There was independent evidence by witnesses stating who the sellers were, who the purchasers were, and who the ultimate possessors of the allegedly stolen cattle were. Of the 17 buyers' sheets offered only 9 were ultimately allowed in evidence; 4 were stricken for failure to connect with the defendant; and 4 were not admitted at all, thus leaving 9 in evidence. Two of these buyers' sheets merely supplemented the sellers' sheets previously given Hansen. Four of the buyers' sheets merely accounted for the remaining head of cattle sold by Hansen on October 26, 1965 and thus had no direct relationship to the cattle allegedly stolen. Three of the other buyers' sheets supplemented Bill Henderson's selling sheet of April 21, 1966 on the cattle previously purchased from Hansen on October 26, 1965. All of these exhibits admitted into evidence confirmed the information contained on the sellers' sheets and testified to by the witnesses. Hansen was not prejudiced by this evidence, which was

clearly relevant and competent, absent any issue of a violation of the pretrial order. Even if error were committed by the trial court in failing to apply any of the sanctions permissible under Rule 16 (g), the error must be prejudicial to the defendant's substantial rights before the case should be reversed on that ground. Osborne v. United States, 351 F.2d 111 (8 Cir. 1965). We, however, do not think Rule 16(g) required the application of sanctions but allowed the trial court discretion in admitting competent evidence not disclosed to the defendant as contemplated by a pretrial order. The language used in the Rule 16(g) is permissive, " * * * the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances." The Court exercised its discretion and there has been no showing of abuse. The Fifth Circuit in considering the impact of new rule 16, Fed.R.Crim.P., held in Gevinson v. United States, 358 F.2d 761, 766 (1966), cert. denied 385 U.S. 823, 87 S. Ct. 51, 17 L.Ed.2d 60, "An application for relief under these rules is a matter within the sound discretion of the court, and the controlling test is whether there was an abuse of that discretion."

■ We think the buyers' sheets should, under the pretrial order, have been called to the attention of opposing counsel or to the Court as there was a continuing obligation to disclose under Rule 16(g). The evidence, however, was merely supplementary to and explanatory of the other evidence made available to Hansen's counsel. It was not prejudicial to Hansen and we think the Court properly admitted it to provide an easier understanding of the chain of title on the allegedly stolen cattle. As pointed out by Hansen a criminal proceeding is not a sporting event. Giles v. State of Maryland, 386 U.S. 66, 102, 87 S.Ct. 793, 17 L. Ed.2d 737 (1967). The purpose of a trial is to ascertain the truth, which is what the District Court clearly attempted to do.

## ACCUMULATED EFFECT OF ALLEGED ERRORS

Hansen's last contention is that the accumulated effect of the alleged failure of the Government to provide a jury list representing a true cross-section of the community, the failure of the Government to comply with a continuing duty of disclosure under Rule 16(g), Fed.R. Crim.P., together with the United States District Attorney's argument on the defendant's evidence and actions by the Court in making reference before the jury to motions made by Hansen's counsel outside the hearing of the jury, all added together, deprived the defendant of a fair trial.

■ We have dealt with the principal contentions and do not think this broad charge requires extended discussion. Hansen cites no cases for this contention, except Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), which held the test is whether any error itself had a substantial effect on the jury's decision. If any properly alleged and preserved point of error is prejudicial it would be the basis for a new trial. But as noted in Hammond v. United States, 356 F.2d 931, 933 (9 Cir. 1966) "Any number of 'almost errors,' if not 'errors,' cannot constitute error." We have reviewed the objections made, many of which were not preserved by objections made at the trial and thus need not be considered, and others were on the admission or exclusion of evidence, which primarily rests in the sound discretion of the Court, and find no error. Hansen had a fair trial and as has been commonly recognized, a defendant is entitled to a fair trial, not a perfect one. See, United States ex rel. Weber v. Ragen, 176 F.2d 579, 586 (7 Cir. 1949), cert. dismissed 338 U.S. 809, 70 S.Ct. 49, 94 L.Ed. 489.

Judgment affirmed.