**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**William E. OWEN, Jr., Frederick Morse Allen, Joseph G. Scata, and Julius Grossman, Defendants-Appellants.**

**No. 72-3646.**

United States Court of Appeals,
Fifth Circuit.

April 19, 1974.

Rehearing Denied May 28, 1974.

Arthur W. Tifford, Miami, Fla. (Court-appointed), for William E. Owen, Jr.

Theodore J. Sakowitz, Asst. Federal Public Defender, Miami, Fla., for Frederick Morse Allen.

Milton E. Grusmark, Miami Beach, Fla., for Joseph G. Scata.

Edward N. Moore, Miami, Fla., for Julius Grossman.

Robert W. Rust, David Quinn, Sp. Atty., Dept. of Justice, Miami, Fla., John T. Spotila, Appellate Section–Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before RIVES, WISDOM and MOR-GAN, Circuit Judges.

RIVES, Circuit Judge:

William E. Owen, Jr., Joseph G. Scata, Julius Grossman, Frederick Morse Allen and seven others were indicted for conspiracy, 18 U.S.C. § 371; substantive violations of the federal mail fraud statutes, 18 U.S.C. §§ 1341, 1342, 1343; and aiding and abetting, 18 U.S.C. § 2. After a jury trial, Owen, Scata, Grossman and Allen all were convicted on the conspiracy count.[1] Also, Scata was convicted on six substantive counts; Owen on five substantive counts; and Grossman on two substantive counts.[2] Scata was sentenced to concurrent four-year prison terms on the substantive counts and to a consecutive two-year term on the conspiracy count. Owen was sentenced to concurrent four-year terms on five counts and to a consecutive one-year term on one count. Grossman was placed on probation for three years and fined $5,000. Allen was placed on probation for four years and fined $3,000. All four convicted defendants appeal.

The government's theory in this case is that the appellants and others devised and implemented a scheme to defraud suppliers of merchandise, and used the mails and wire communications in furtherance of their scheme. On May 26, 1971, William Owen bought Porter Hardware, Inc., a small hardware store in Miami, for about $5,000. Between May 26 and August 6, 1971, Porter placed orders for substantial quantities of merchandise. The government introduced evidence showing that Porter personnel in placing these orders sometimes used fictitious names. Numerous sellers supplied goods to Porter, many of them relying upon the credit reputation developed by the former owner. Most of the goods delivered to Porter were dissipated, that is, given away, resold at less than cost, and stored for later distribu-tion at various warehouses. Deliveries were not used to replenish or increase the store's stock of goods. Only about $20 was kept in the store's cash register and little business was done with walk-in customers inside the store. At least $35,000 worth of merchandise delivered to Porter on credit was never paid for. The government insists that the appel-lants never intended to pay for the mer-chandise ordered on credit.

I. *Sufficiency of the Evidence to Show a Violation of 18 U.S.C. § 1341 or § 1343.*

We first consider whether the acts proved by the government come within the scope of the mail fraud and wire communication fraud statutes. The most recent case in which the Supreme Court has considered the reach of 18 U.S.C. § 1341 is United States v. Maze, 1974, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed. 2d 603. The Court held that where an individual used a stolen credit card to obtain goods and services from motel operators, the sales slips were mailed by the motel operators to a bank, and the bank in turn mailed the slips to the true owner of the card, the mailings were not so closely related to the scheme as to bring the individual's conduct within the scope of 18 U.S.C. § 1341.

 Count 8 of the indictment in this case charged that certain defendants, for the purpose of executing the scheme, knowingly caused a letter addressed to the Gulf Oil Corporation in Atlanta to be sent and delivered by the U. S. Post Office Department and Postal Service. According to the government's brief on appeal, this count was based upon the mailing of credit card hardbacks from a service station to Gulf after the use of a Porter Gulf credit card by a Porter em-ployee acting at appellant Scata's direc-tion. Under the holding in *Maze*, Sca-ta's conviction under Count 8 must be reversed. We find nothing to distin-

---

1. Count 15 of the indictment.

2. Scata was convicted on substantive Counts 2, 4, 5, 7, 8, 12; Owen on substantive Counts 2, 4, 5, 7, 12; and Grossman on substantive Counts 4 and 5.

guish the situation here from the situation in *Maze*.

■ Count 2 of the indictment charged that certain defendants caused the mailing of a letter to Colony Paints in Baltimore, Maryland. This count was based upon a purchase order signed by Owen and given to a Colony salesman. Count 5 alleged that certain defendants caused a letter to be sent to Delta Finance Corp. of Cincinnati, Ohio. Testimony at trial indicated that Porter ordered 100 cameras from Delta by mail. Count 7 alleged that certain defendants caused Atlas Tool and Manufacturing Co. to send a letter to Porter. This count rested upon a mailing to Porter of ten minibike manufacturer's certificates necessary to license the minibikes under Florida law. Count 12 alleged that certain defendants "transmitted and cause[d] to be transmitted signs, signals, and sounds in interstate commerce by means of a wire communication, that is, a telephone conversation between Miami, Florida, and Brunswick, Georgia." (R. 14.) By this conversation, Porter ordered paint from Dixie-O'Brien Corporation.

The communications in Counts 2, 5, 7 and 12 are readily distinguishable from the situation in *Maze, supra*. In *Maze*, the mailings occurred after the defendant had perpetrated the fraud and obtained the goods or services which were the object of the scheme. By contrast, the communications in these counts were a necessary part of the commercial process which led to Porter's receipt of marketable goods on credit. The relation of these communications to the scheme sufficed to bring the conduct within the scope of 18 U.S.C. § 1341 and § 1343.

■ Count 4 of the indictment presents a closer question. Count 4 charged that certain defendants caused Moore-Handley Hardware of Birmingham, Alabama, to send a letter to Porter. This letter confirmed a phone order for a substantial quantity of garbage cans and a number of plastic coolers. It also stated that "Prices are fob Miami with delivery by the manufacturer's truck. Our terms are 2%–10th Prox, net 30 days." The letter further stated that "Enclosed is credit form which we ask that you fill out and return in the enclosed envelope." Unlike the communications involved in Counts 2, 5, 7 and 12, this letter was not, from Porter's point of view, necessary in order to receive marketable merchandise. This letter was, however, in accord with business practices associated with the sale of goods, and Moore-Handley obviously sent this letter as a part of the transaction which resulted in the shipment of merchandise to Porter. Under these circumstances, the jury could have found that the defendants "caused" the mails to be used, Pereira v. United States, 1954, 347 U.S. 1, 9, 74 S.Ct. 358, 98 L.Ed. 435, and that the mailing was sufficiently closely related to the scheme so as to bring the conduct within the statute. United States v. Maze, *supra*.

## II. *Sufficiency of the Evidence as to Individual Defendants.*

Appellants do not contend that Porter Hardware was a legitimate business operation during the period from May 26 until August 6. As to Scata, Grossman and Allen, each claims that there was insufficient evidence to support his conviction for conspiracy and for the various substantive offenses.

### A. *Scata*

■ Scata claims that the evidence discloses only that he was present at the Porter Hardware store from time to time. In support of this contention, Scata quotes the trial judge, who stated the following in denying a motion for judgment of acquittal on one of the substantive counts: "Now, let me say to you with respect to Scata that I recognize that virtually in no instance is there any specific documentary reference to him. But there is evidence to show his fairly regular presence." (Tr. 1629.) It is true that mere presence at the scene of a crime, or mere association with those involved in a criminal enter-

prise, is not sufficient to prove participation in a conspiracy. United States v. Falcone, 1940, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128; United States v. Webb, 6 Cir. 1966, 359 F.2d 558. However, this is not such a case. The record shows that Scata received merchandise from Porter for his personal use. The items he received apparently included brushes and hoses, a machine for making threads on a screw, a battery, a boat hoist, paint for his home, two minibikes, some wood, and other boxes of unidentified goods. The receipt of these items during little more than a two month period, together with his frequent presence at the store, could have led the jury to believe that Scata knowingly encouraged the scheme by taking for his personal use some of the fruits of the fraud.

■ There was evidence that Scata helped arrange at least one sale of merchandise—a witness testified that he bought a minibike from Porter, and that Scata asked him to come by his house to pick it up. Also, on one occasion Scata told a woman who needed tires to come to Porter Hardware. When the woman came to the store, Scata was present. He took her car keys and gave them to a Porter employee who then used a Porter credit card to get new tires. The woman was never billed for the tires. Included in police informant Snider's testimony for the government is the following:

"Q. After you began working, Mr. Snider, at Porter Hardware, Inc., did you have occasion at any time to see or talk with the defendant Joe Scata at Porter Hardware, Inc., or elsewhere concerning Porter Hardware's business?

"A. Yes. Mr. Scata was in there frequently. I was introduced to him by Bill [Owen] when I started there. Their initial conversation there was basically Mr. Scata was interested in more than anything whether or not I

could be trusted as an employee there." (Tr. 1162–1163.)

From these incidents, coupled with his frequent presence at the store, the jury might reasonably have inferred that Scata was more than merely a bystander at Porter Hardware; that, in fact, he was directly involved in the operation if not the management of the enterprise; and that he was aware of and aided in the conspiracy to defraud suppliers by the use of the mails and wire communication.

Scata urges that the evidence shows no participation by him in the communications which form the basis of the substantive counts of the indictment. The government responds that Scata was an aider and abettor on each of the substantive counts, and that Scata received substantial portions of the merchandise ordered from the various suppliers.

■ The jury could have inferred from the evidence that there was a conspiracy to defraud suppliers of merchandise, and that Scata was a member of the conspiracy. It follows that the jury could find Scata liable as an aider and abettor in the various substantive offenses. The substantive offenses charged in the indictment result from transactions between Porter Hardware and various suppliers. The individual transactions were merely a part of the general plan. If Scata participated to the extent that he conspired with others in a scheme designed to defraud suppliers, then the jury could properly find that he expected and encouraged the individual communications which constitute the substantive offenses. This would be sufficient participation to make Scata an aider and abettor under substantive Counts 2, 4, 5, 7 and 12.

This result is consistent with Pinkerton v. United States, 1946, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489, where the Supreme Court states that a party to a continuing conspiracy may be responsible for substantive offenses committed by a coconspirator in furtherance of the conspiracy, even though he does not par-

ticipate in the substantive offenses or have any knowledge of them.

### B. *Grossman*

■ Grossman urges that the evidence of record was insufficient to submit the question of his guilt to the jury. We disagree.

Police informant Snider testified that Grossman was in the store "some weeks every day. Other times he would be in three or four times a week." (Tr. 1198.) He overheard Grossman talk with Owen about "certain items that were to arrive at the store that day, and that he [Grossman] was to come back later in the afternoon to check them out, if he wanted to purchase them" (Tr. 1199), and about the fact "that the items that Julie was waiting for had not come in yet" (Tr. 1200). Another witness testified that Grossman, when he came to the store, would sometimes ask: "Well, did you get any new shipments in today, something that I may be interested in?" (Tr. 273.)

Snider also testified concerning a conversation he had with Grossman. Grossman allegedly said that "he liked my [Snider's] security because I kept watching for people to see if anybody would be following us" (Tr. 1204); that "I [Grossman] do not want to be around Porter Hardware in the event or whenever police are called in or if they are called in" (Tr. 1206); and that "he [Grossman] felt that it was getting very warm here" (Tr. 1206). Snider testified that on one particular trip he hauled a truckload of merchandise from the warehouse to Grossman's home, helped unload it, and received $400 from Grossman for Owen.

Policeman Tucker testified that Grossman's vehicle was used on a regular basis at Porter Hardware. Tucker further testified that Grossman stated during an interview that he had been at Porter Hardware many times and had purchased power drills, tools, coolers, caulking compound, screwdrivers, and Polaroid cameras. Grossman also stated

that he paid less than wholesale for the items he bought.

The jury could have concluded that Grossman's comments to Snider about security and about the police revealed a guilty mind. These comments, plus Grossman's purchases from Porter, including purchases at below the wholesale price of the merchandise, are sufficient to support his conviction on the conspiracy charge. Grossman's purchases of garbage cans and Polaroid cameras, taken together with the other evidence against him, could have led the jury to infer that Grossman knowingly encouraged the mailings which led two suppliers to send merchandise to Porter Hardware. We therefore conclude that the evidence was sufficient to hold Grossman liable as an aider and abettor under substantive Counts 4 and 5 of the indictment.

### C. *Allen*

■ Allen claims that there is not the slightest hint in the record of an agreement between him and any other person for the commission of a crime. We view the record differently.

Informer Snider testified that Allen was present at Porter Hardware "very often, two to three times, four times a week and sometimes more. He was there as a buyer of the products which came in." (Tr. 1180.) Snider further stated that he delivered a truck full of plastic garbage cans to Allen, and that he helped Allen load battery cables, cutlery and other items into Allen's car for sale to customers. On one occasion Allen explained the Porter operation to Snider as follows: "He told me that items were bought on credit and then sold for cash at half their wholesale price or whatever their billing price was; that this was the going figure." (Tr. 1188.) According to Snider's testimony, Allen also suggested burning the insulation from copper wire to sell the copper for about $15,000 as scrap metal.

Policeman Tucker testified that Allen told him that he was a salesman for Porter and had sold aerosol paints, gar-

bage cans, garden hoses, Black and Decker tools, and barbecue (equipment).

From this evidence, the jury could have inferred that Allen knew about the Porter Hardware operation, and that, through his efforts to resell the merchandise, he participated in the scheme to defraud suppliers.

### III. *Owen's Claims.*

On August 6, 1971, police officers stopped the automobile which Owen was driving, and one officer searched through a paper bag on the front seat of the vehicle. He found a revolver. Owen was thereupon arrested and later charged with violation of 18 U.S.C. App. § 1202(a), possession of a gun by a convicted felon. At the police station, Postal Inspector Conner, who was investigating Porter Hardware, interviewed Owen and told him he was suspected of mail fraud. Conner invited Owen to come to his office at a later date to discuss the situation. Owen went to Conner's office on August 10 and on a number of later occasions.

The government and Owen apparently agree that, at a hearing on the gun charge on August 12 before the United States Magistrate, government attorney Quinn advised Owen's counsel, Koste, that in return for Owen's cooperation and testimony in a mail fraud case, either Owen would not be indicted or, if Owen were indicted and convicted, the government would recommend probation. Koste recalled that Owen was to be "an unindicted coconspirator or an indicted coconspirator." (Tr. on Motions to Suppress, 429–430.) Owen now claims this indicates he was to be indicted, if at all, on only one count of conspiracy. The gun charge was later dismissed.

Sometime between September 12 and October 9, 1972, Owen's new attorney, Tifford, spoke with Quinn. According to Tifford, Quinn on this occasion stated that the government would advise the court of Owen's cooperation, but would not recommend probation. Quinn, in a conference before the judge during the

trial, could not recall whether he specifically mentioned a recommendation of probation in his conversation with Tifford. Quinn did make clear at trial, however, that so long as the trial continued, the government stood ready to recommend probation if Owen would cooperate and testify.

■ A. Owen claims first that the agreement in question and certain evidence obtained pursuant to the agreement were "tainted" by being the direct or indirect products of an illegal search, seizure and arrest, and should have been suppressed. The government replies that the search of Owen's car, the seizure of the revolver, and the subsequent arrest were legal. The government further responds that even if the arrest was illegal, Owen's cooperation with Conner was voluntary and with full awareness of his rights. We do not pass upon the legality of Owen's arrest on the gun charge, for it is clear to us from the facts of this case that, even assuming that the arrest was unlawful, any taint arising from the arrest had dissipated by the time Owen agreed to cooperate with the authorities in the mail fraud case.

In Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, the Supreme Court held that the statements by one defendant, Toy, made in his bedroom at the time of an unlawful arrest, were the fruits of unlawful action, and should have been suppressed. The Court likewise held that the narcotics taken from another defendant on the basis of Toy's statements were fruits of illegality, and should not have been admitted. The Court in *Wong Sun* recognized, however, that the connection between an illegal arrest and a subsequent statement could " 'become so attenuated as to dissipate the taint.' Nardone v. United States, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L.Ed. 307." 371 U.S. at 491. On the evidence that one defendant had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make a statement, the Court found that

such a dissipation had occurred, and upheld a conviction based in part upon the statement. The Court emphasized that the test of admissibility was not whether the evidence would not have come to light "but for" the illegal actions of the police; "[r]ather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." 371 U.S. at 488.

This Court has discussed *Wong Sun* on a number of occasions and has developed several guidelines to help determine when the taint of an illegal arrest is sufficiently dissipated that evidence secured after the arrest is admissible in a criminal trial. Rogers v. United States, 5 Cir. 1964, 330 F.2d 535; Thomas v. United States, 5 Cir. 1967, 377 F.2d 118; Phelper v. Decker, 5 Cir. 1968; 401 F.2d 232; Bretti v. Wainwright, 5 Cir. 1971, 439 F.2d 1042. These guidelines include the proximity of the illegal arrest to the procurement of the evidence; the intervening occurrences between the arrest and the acquisition of the evidence, and the circumstances under which the arrest was made. Phelper v. Decker, *supra*, 401 F.2d at 237–238.

So far as the record indicates, no one interrogated Owen, or elicited information from him, or offered him a deal while he was in custody on the gun charge. Conner did speak with Owen soon after his arrest on August 6; however, according to Conner's uncontradicted testimony, only the following occurred:

> "I told Mr. Owen that we had been conducting surveillance at Porter Hardware, the activities that had been going on there were not legitimate operations; that he concurred that I would want to talk to him further about it and that he would come down to the office." (Tr. on Motions to Suppress, 372.)

Four days later, after his release from custody, Owen voluntarily visited Conner at Conner's office. At this time Conner and Owen apparently discussed the possibility of Owen's cooperation with the authorities in the Porter Hardware case. On both August 6 and August 10, Conner advised Owen of his constitutional rights, including his right to an attorney.

From these facts it seems clear that any taint associated with Owen's arrest had dissipated by the time Owen agreed to cooperate with the government in its investigation. We note particularly the four-day time lapse between the arrest and the initial discussion, the voluntariness of Owen's visit to Conner's office, the lack of oppressive or custodial circumstances at the time that Owen and Conner discussed an agreement, the legal warnings provided by Conner, and the fact of a *quid pro quo* for Owen's cooperation.

■ B. Owen's second contention is that enforcement of the bargain would bar his prosecution. Santobello v. New York, 1972, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427, establishes that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled. This case might more generally support the proposition that where a prosecutor has made a promise or agreement, the defendant may hold him to it. At trial, however, Owen did not attempt to hold the prosecutor to the original agreement.

■ When the trial judge asked Tifford whether Owen was proposing to testify in return for a recommendation of probation, Tifford replied: "No, Judge, Mr. Owen is of the position that when the Government backed off, his consent was negated." (Tr. 707.)

Tifford later commented:

> "My answer is that Mr. Owen is not testifying, and the part of the reason is that among other things I do not believe the Government can revitalize

a promise made after its retracted position taken at trial because of that retraction." (Tr. 714–715.)

Tifford thus indicated that Owen did not seek specific performance of the plea bargain at trial. To the contrary, he insisted upon his right to undo whatever had been done pursuant to the agreement. Owen cannot now switch fields. He waived whatever rights he had to demand performance of the agreement when he chose to pursue a different strategy.

■ C. Owen's third contention is that when the government suggested that it would violate its part of the agreement, he had the right to rescind the agreement, and to suppress any evidence secured by the government as a result of prior cooperation under the agreement. The government theorizes that Owen suffered no prejudice from any temporary repudiation, since at trial the government stood ready to recommend probation if Owen would cooperate and testify.

The trial judge denied Owen's motion to suppress evidence obtained by the government through Owen's cooperation under the agreement. In particular, Owen had objected to many exhibits allegedly found after he consented to a search of the Porter Hardware premises. The trial judge in denying Owen's motion explained that,

" * * * as I see the evidence and see the proof, the Government stands fast and did at the beginning of the trial on this question of offering a recommendation of probation if Mr. Owen testified. And we are now at the point where Mr. Owen has not testified. And I think it does not reach the level of even having to pass upon it. In other words, I think the Government is ready and Mr. Owen apparently is not." (Tr. 1602.)

Clearly, Owen was entitled to refuse at any time to cooperate further with the authorities and to refuse to testify at the trial. The difficult question concerns whether evidence obtained through Owen during the period of cooperation should have been admitted, if the government first repudiated the agreement and later offered to reinstate it. A contract analogy suggests that the government's retraction of its promise entitled Owen at his option to rescind the agreement and to recover (in this case, through suppression) any prior performance under the agreement.[3] Commercial law also suggests that until the government's next performance was due, it could retract its repudiation, unless Owen had cancelled the agreement, materially changed his position, or otherwise indicated that he considered the repudiation final.[4] In this case Owen claims that his attorney made clear his cancellation of the agreement.

One problem with relying upon a commercial law analogy is that the provisions regarding anticipatory repudiation are based in part upon a desire to allow the nonbreaching party an opportunity to make new arrangements with others as a substitute for the repudiated contract. In the case of an agreement with the prosecutor, there is no other party besides the government with whom the prospective defendant may deal. This undercuts the argument that commercial law principles should be followed insofar as they give a nonbreaching party an absolute right to cancel or rescind an agreement, and a right to recover any part performance, upon anticipatory repudiation by the other party.

The government argues that even if there was an anticipatory repudiation, there was no injury or prejudice to Owen, and thus no reason to allow Owen a right to rescind the agreement.[5] This argument has considerable force in the

---

3. Uniform Commercial Code § 2–610, § 2–703, § 2–711.

4. Uniform Commercial Code § 2–611.

5. The word "rescind" in this context includes a right to "recover" past performance, in this case through suppression.

circumstances of this case. First, the government at trial offered to perform its part of the bargain. In conference with the trial judge, Owen's attorney did not claim that the government was not offering that which had originally been promised. Therefore, Owen at the time of the trial apparently could have secured exactly that for which he originally bargained. Second, Owen alleges no particular prejudice or injury as a result of the government's temporary repudiation. Some possible grounds of prejudice were discussed in a conference before the trial judge. Owen's attorney suggested that Owen had been prejudiced "by virtue of his posture as being a defendant in the case, by certain evidence coming in." (Tr. 717.) Owen apparently felt that this might prejudice the judge against him. It was also suggested that the government's action interfered with the trial preparations of Owen and the other defendants. Neither of these claims is made in Owen's brief on this appeal, and we conclude that both are insubstantial under the circumstances of this case.

In the absence of any prejudice to Owen, we conclude that the government's alleged temporary repudiation did not give Owen the right to rescind the agreement at a time when the government was ready, able and willing to perform its part of the bargain.

### IV. *Other Claims.*

■ A. Appellants contend that the jury selection procedure in operation in the Southern District of Florida at the time of their trial was unconstitutional because it excluded young persons (18 to 21 and 21 to 24), Latin Americans, and new residents (those who had not resided in the district for a year). This Court has considered and rejected these identical claims in a number of

prior cases,[6] and we do so again in the circumstances of this case.

■ The appellants in this case are not in a position to raise the issue considered in United States v. De Alba-Conrado, 5 Cir. 1973, 481 F.2d 1266. After the jurors were sworn, the following occurred:

"MR. GRUSMARK: For the purpose of the motion before the Court, may I be permitted to ask how many are from Dade and Broward Counties?

(Bench conference concluded)

"THE COURT: Those of you who are in Dade County, will you raise your hands, please?

Those of you who are from Broward County, please raise your hands.

"MR. GRUSMARK: Thank you, Judge.

"THE COURT: Would you agree there is a substantial number from each county?

"MR. GRUSMARK: Yes, sir." (Tr. 25.)

The record reveals that counsel and the trial judge had agreed that Mr. Grusmark, Scata's attorney, would act as primary spokesman for the defendants, and that objections made by him would apply to all. Under these circumstances, Mr. Grusmark's response to the court's question, and the failure of any of the other defendants to object to Mr. Grusmark's response, preclude the defendants from relying upon the argument raised in United States v. De Alba-Conrado, *supra.*

■ B. Appellants Owen and Grossman contend that the speed with which the prosecution proceeded to trial, the brevity between the discovery conducted by the government pursuant to court order and the outset of trial, and the manner in which discovery was ef-

6. See United States v. Perry, 5 Cir. 1973, 480 F.2d 147; United States v. Palacio, 5 Cir. 1973, 477 F.2d 560; United States v. Pentado, 5 Cir. 1972, 463 F.2d 355; United States v. Blair, 5 Cir. 1972, 470 F.2d 331; United States v. Gooding, 5 Cir. 1973, 473 F.2d 425.

fected prior to and during the early stages of this trial denied them effective assistance of counsel.

There was a good deal of confusion and difficulty in the disclosure of evidence in this case. The trial judge was alerted to the problems which arose and made continuing efforts to insure that the defendants received all the materials to which they were entitled. The judge insisted, however, that the trial go forward and denied a motion to dismiss based on the government's failure to produce certain statements.

United States v. Saitta, 5 Cir. 1971, 443 F.2d 830, 831, suggests the law to be applied in examining whether appellants' claims here would justify reversal:

> "Appropriate relief for a violation of the discovery rules lies within the sound discretion of the district court, Gevinson v. United States, 5 Cir., 1966, 358 F.2d 761, 766; Ginsberg v. United States, 5 Cir., 1958, 257 F.2d 950, 956, but we do not reach the question of an abuse of discretion here. It suffices to say that an error in administering the discovery rules is not reversible absent a showing that the error was prejudicial to the substantial rights of the defendant. Hansen v. United States, 8 Cir., 1968, 393 F.2d 763, 770."

In the instant case, appellants have alleged no specifics about how they were harmed by the trial court's refusal to grant a continuance. They have not shown prejudice of the sort which might require reversal, even if the trial court had abused its discretion, of which contingency we are by no means convinced.

The judgment of conviction of Appellant Scata under Count 8 of the indictment is reversed. Otherwise, we find no reversible error as to any of the appellants and their respective judgments of conviction are affirmed.

Reversed as to Appellant Scata insofar as Count 8 of the Indictment is concerned. In all other respects, affirmed as to each of the appellants.